IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

CLF 007, an individual;
CLF 008, an individual,

     Plaintiffs,

  vs.

COOPERSURGICAL, INC.;
THE COOPER COMPANIES, INC.,

     Defendants.

_____

Civ. No. 6:24-cv-0990-AA

**OPINION & ORDER**

AIKEN, District Judge:

  Plaintiffs CLF 007 and CLF 008, individuals, bring claims in strict products liability, negligence, gross negligence, unjust enrichment, and trespass to chattels against Defendants CooperSurgical, Inc. and The Cooper Companies, Inc. *See* Compl., ECF No. 1. Defendant CooperSurgical, Inc. moves to dismiss for failure to state a claim under Rule 12(b)(6), ECF No. 24. Defendant Cooper Companies, Inc. moves to dismiss the case for lack of personal jurisdiction under Rule 12(b)(2), ECF No. 19, and for failure to state a claim under Rule 12(b)(6), ECF No. 25. For the reasons explained below, CooperSurgical, Inc.'s Motion to Dismiss, ECF No. 24, is GRANTED in part and DENIED in part. The Court DEFERS ruling on The Cooper Companies, Inc.'s Motion to Dismiss for lack of personal jurisdiction, ECF No. 19, and

its Motion to Dismiss for failure to state a claim, ECF No. 25. Plaintiffs shall have 90 days to conduct limited discovery consistent with this Opinion.

## BACKGROUND

The Cooper Companies, Inc. ("Cooper Companies") is the parent company of Cooper Medical Inc., which is the parent company of wholly owned subsidiary CooperSurgical Inc. ("CooperSurgical"). Def. Mot. at 1, 2, 15; Avery Decl. ¶¶ 6–7, Ex. A, ECF No. 19-1. Cooper Companies is incorporated in Delaware and has its principal place of business in California. Def. Mot. at 12.

Plaintiffs CLF 007 ("Plaintiff 007") and CLF 008 ("Plaintiff 008"), a married couple who reside in Oregon, "have attempted to conceive naturally[]," for fifteen years but without success, so they turned to *in vitro* fertilization ("IVF"), an assisted reproductive technology ("ART"). Compl. ¶ 45, 1, 2. In November 2023, at age 40, Plaintiff 007 underwent an egg-retrieval procedure that successfully yielded nineteen eggs. *Id.* at ¶ 46. "From those [nineteen] eggs, fifteen fertilized embryos were created using Plaintiff 007's eggs and Plaintiff 008's sperm." *Id.* at ¶ 47. "Plaintiffs were incredibly excited that they [might] have a high number of embryos reach [the] blastocyst [stage] on Day 5 [after fertilization,]" at which time they could be implanted in Plaintiff 007's uterus. *Id.* at ¶¶ 47, 21, 24, 25.

"Plaintiffs' excitement was short-lived [because] Plaintiffs doctor informed them that *none* of their fifteen fertilized embryos had made it to blastocyst on Day 5[,]" an "incredibly devastating and unusual result." *Id.* at 48 (emphasis in original). At Day 6 after fertilization, some of Plaintiffs' remaining embryos, though late in

development, had reached the blastocyst stage. *Id.* at ¶ 49. After genetic testing of those embryos, "Plaintiffs discovered that they had one genetically normal embryo, which they later discovered was a boy." *Id.* at ¶ 50. "Although Plaintiffs had hoped for more viable embryos, they were so excited for their 'baby boy.'" *Id.* "At this point, Plaintiffs believed that their low numbers were solely the fault of their own genetic material." *Id.*

"A month after Plaintiff 007's [egg] retrieval," Plaintiffs' doctor informed Plaintiffs that, after the egg retrieval, their embryos had been placed in an embryo culture media manufactured by Defendants that had been recalled on December 5, 2023, because it was "deficient" in magnesium, a "crucial nutrient" for embryo survival and development *Id.* at ¶ 51, 59–62. "[G]iven the ['boy' embryo's] exposure [to the recalled embryo culture]" and that "there [was] no good information on whether [that] embryo was usable or if it was likely to have developmental or other defects in pregnancy or later in life[,]" Plaintiffs decided to not transfer that embryo to Plaintiff 007's uterus. *Id.* at ¶ 51.

Plaintiffs' failed round of IVF "severely impacted" Plaintiffs' ability to have children. *Id.* at ¶ 52. The fertility procedures took a "physical toll," especially on Plaintiff 007, who underwent "a variety of hormone[] and medication[]" injections "to stimulate the ovaries and develop eggs[,]" i*d.* at ¶¶ 52, 21, injections that can cause side effects such as injection site complications and, "bloating, weight gain, water retention, bone loss, fatigue, headaches, muscle aches, abdominal pain, breast tenderness, vaginal yeast infections, vaginal dryness, . . . hot flashes, mood swings,

depression, nausea, vomiting, diarrhea, clots in blood vessels and strokes[,]" *id.* at ¶ 22. Plaintiff 007 also underwent "frequent transvaginal ultrasound monitoring and other tests to monitor egg development," and, finally, an egg retrieval process, "a surgery to collect the eggs," done under anesthesia and involving a large needle inserted through the vaginal wall. *Id.* at ¶ 23.

"Plaintiffs [also] expended significant financial resources to undergo these fertility procedures." *Id.* at ¶ 52. They "sold one of their cars[,]" "spent months saving up—feeling that this cycle was their "last shot" at being parents[,]" and "used up much of their available time-off balances at work to attend their various appointments and procedures." *Id.* at ¶ 53.

Despite Plaintiff 007's "advanced age," Plaintiffs decided "to undergo another IVF cycle[,]" causing further "financial strain" and "particular toll on Plaintiff 007, who must again subject herself to the many medications required to prepare for [egg] retrieval." *Id.* at ¶ 57. "Plaintiffs want to feel excited and hopeful for the results of their cycle—but they already feel defeated." *Id.* "Plaintiff 007's advanced age" means that they "have a significantly lower chance of yielding any useable embryos." *Id.* Plaintiffs' "loss ha[s] caused both Plaintiffs . . . emotional distress, . . . deep sadness, guilt, hopelessness, shame, disappointment, and anger." *Id.* at ¶ 58. They "struggle to find the confidence to continue with this emotionally taxing journey." *Id.*

Plaintiffs allege that Defendants CooperSurgical and Cooper Companies "manufactured, marketed, promoted, distributed, and/or sold media to be used for culturing and development of human embryos, [and] marketed that their media

provided 'an optimized in vitro environment,' which is necessary to ensure that fertilized human eggs can survive and develop into embryos viable for implantation." *Id.* at ¶¶ 4, 12, 14, 63, 72. Plaintiffs also allege that Defendants "represented that they properly and adequately tested their embryo culture media before" selling and distributing the media to "clinics and/or healthcare practitioners[.]" *Id.* at ¶ 5.

Plaintiffs allege that the recalled lots of Defendants' culture media were deficient in magnesium because the hoppers at Defendants' manufacturing plants ran out of magnesium but that Defendants produced and sold several lots of that defective media, including the media used by Plaintiffs. *Id.* at ¶¶ 42, 62, 64, 65.

Plaintiffs allege that "[m]agnesium is a critical ingredient of embryo culture media" because it is "an essential nutrient in embryonic and human fetal growth." *Id.* at ¶ 27. Plaintiffs allege that after egg retrieval, eggs are "immersed, typically in a petri dish" that contains the culture media, they are then fertilized and develop in the lab. *Id.* at ¶ 26. While in the petri dish, the eggs are supported and protected in the early stages of development by the embryo culture media, "just as a woman's body would do during natural conception." *Id.* at ¶ 29.

Plaintiffs allege that the defective culture media "was almost certainly the cause of the damage and destruction of Plaintiffs' . . . embryos[,]" *id.* at ¶¶ 51, 85, 86, and that "the new [IVF] cycle [was] necessitated by Defendant's faulty product[,]" *id.* at ¶ 58.

Plaintiffs allege that during manufacture, Defendants failed to "monitor their assembly line manufacturing process [and] properly refill the magnesium hopper

when it was empty[,]" *id.* at ¶ 64, and that they "continued to manufacture embryo culture media despite the empty magnesium hopper [and] produce[] embryo culture media that lacked a nutrient critical for embryonic development[,]" *id.* at ¶ 65. Plaintiffs also allege that "Defendants did not properly test the impacted [media] lots . . . until after receiving formal complaints from numerous fertility clinicians— including those who worked on Plaintiffs' embryos—that developing embryos were dying due to their product." *Id.* at ¶ 66.

Plaintiffs allege that Defendants "failed to warn consumers" including Plaintiffs and their fertility providers who purchased the embryo culture media, that "the embryo culture media had not been properly . . . tested [and] lacked ingredients essential to embryonic growth. *Id.* at ¶ 94. As to the recall, Plaintiffs allege that Defendants knew or should have known that the media was defective "for a significant period of time before they issued the recall[,] *id.* at ¶¶ 118–120, but "intentionally did not immediately disseminate notice of [those] lots publicly or throughout the IVF community[,] *id.* at ¶¶ 59–60.

LEGAL STANDARD

I.    *Motion to Dismiss for Failure to State a Claim*

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the sufficiency of the claims. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). When evaluating the sufficiency of a complaint's allegations, a court must accept a plaintiff's allegations of fact as true and construe them in the light most favorable to the plaintiff. *Wilson v. Hewlett-Packard Co.*, 668 F.3d 1136, 1140 (9th Cir. 2012). But a

plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level[.]" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation" of the action's elements. *Id.* at 555 (internal quotation marks and citation omitted).

To survive a motion to dismiss, a pleading must allege "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

## II.    *Motion to Dismiss for Lack of Personal Jurisdiction*

When faced with a motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2), "the plaintiff bears the burden of demonstrating that the court's exercise of jurisdiction is proper." *Picot v. Weston*, 780 F.3d 1206, 1211 (9th Cir. 2015). But where, as here, the court's determination is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a *prima facie* showing of the jurisdictional facts." *Boschetto v. Hansing*, 539 F.3d 1011, 1015 (9th Cir. 2008). "Uncontroverted allegations in the plaintiff's complaint must be taken as true[,]" and "[c]onflicts between the parties over statements contained in affidavits must be resolved in the plaintiff's favor." *Id.* at 1015; *see also Oregon Int'l Airfreight Co. v. Bassano*, No. 3:21-cv-01480-SB, 2022 WL 2068755, at *9 (D. Or. May

16, 2022) ("[T]he court must resolve any conflicts over statements contained in declarations in the plaintiff's favor[.]").

"Federal courts ordinarily follow state law in determining the bounds of their jurisdiction over persons." *Picot*, 780 F.3d at 1211. Oregon's long-arm statute is co-extensive with constitutional standards, so this Court need only determine whether its exercise of personal jurisdiction is consistent with constitutional due process. *Gray & Co. v. Firstenberg Mach. Co.*, 913 F.2d 758, 760 (9th Cir. 1990); Or. R. Civ. P. 4L; *Oregon ex rel. Hydraulic Servocontrols Corp. v. Dale*, 294 Or. 381, 384 (1982). A federal court's exercise of personal jurisdiction satisfies due process where a defendant has "certain minimum contacts" with the forum state, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Courts recognize two forms of personal jurisdiction: (1) general or "all-purpose" personal jurisdiction and (2) specific or "case-linked" personal jurisdiction. *Great W. Capital, LLC v. Payne*, No. 3:22-cv-00768-IM, 2023 WL 8600536, at *3 (D. Or. Nov. 28, 2023); *Picot*, 780 F.3d at 1211. "Unless a defendant's contacts with a forum are so substantial, continuous, and systematic that the defendant can be deemed to be 'present' in that forum for all purposes, a forum may exercise only 'specific' jurisdiction based on the relationship between the defendant's forum contacts and the plaintiff's claim." *Yahoo! Inc. v. La Ligue Contre le Racisme et l'Antisemitisme*, 433 F.3d 1199, 1205 (9th Cir. 2006).

DISCUSSION

Plaintiffs bring claims in strict products liability, negligence, unjust enrichment, and trespass to chattels claims against Defendants CooperSurgical, Inc., ("CooperSurgical") and The Cooper Companies, Inc. ("Cooper Companies"). Defendants move to dismiss the claims against them.

I.  *Claims against Defendant CooperSurgical*

CooperSurgical moves to dismiss the negligence, gross negligence, negligent failure to recall, unjust enrichment, and trespass to chattels claims against it because the Complaint "fails to meet the minimum pleading standards and fails to allege sufficient facts[.]"  Surg. Mot. at 2, ECF No. 24.

A.  *Negligence*

Defendant asserts that Plaintiffs' negligence claim fails because they "failed to sufficiently plead causation and damages."  *Id.* at 5.  Under Oregon law, the elements of negligence are duty, breach, causation, and damages.  *See Brennan v. City of Eugene*, 285 Or. 401, 405 (D. Or. 1979).

1.  *Causation*

As to causation, Defendants argue that Plaintiffs fail to sufficiently allege "but for" causation, Surg. Mot. at 7, and that "it is unclear from the Complaint which injury CooperSurgical is alleged to have caused[,]" *id.* at 8.

Plaintiffs argue that they sufficiently plead causation because they "allege that *but for* Defendants' defective media, all fifteen of their embryos would not have been compromised or completely destroyed[,]" that their doctor confirmed that Defendants'

media was "almost certainly the cause of the damage and destruction of Plaintiffs' precious embryos[,]" and that they "even alleged some of the scientific reasons why a media lacking magnesium can kill embryos." Pl. Resp. at 9. The Court concludes that Plaintiffs have sufficiently pleaded causation.

    2. *Damages*

As to damages, Defendant argues that damages due to the loss of Plaintiffs' fertilized eggs "are too speculative and remote for recovery," Surg. Mot. 5, that such damages are barred by Oregon's economic loss rule, *id.* at 6; and that, absent physical injury, Plaintiffs cannot recover emotional damages under Oregon's physical impact rule, *id.* at 7.

As to the charge that Plaintiffs' damages claim are too speculative, Plaintiffs respond that damages due to the loss of fertilized eggs are not speculative or remote. Plaintiffs assert that Defendant's caselaw, at the very least "hold that reproductive material outside of the body is property" and that "Plaintiffs will be able to establish, through expert testimony, the extent and value of their damages." Pl. Resp. at 5.

As to the charge that Plaintiffs' damages are barred by Oregon's economic loss rule, Plaintiffs respond that "[t]he economic loss doctrine clearly does not apply[,]" *id.* at 6, because Plaintiffs have alleged "both physical and property damages, as opposed to purely economic losses[,]" *id.* at 7.

Oregon's economic loss rule generally bars recovery in tort for purely economic losses. *Harris v. Suniga*, 344 Or. 301, 305 (2008). The Oregon Supreme Court defines economic loss as "financial losses such as indebtedness incurred and return of monies

paid, *as distinguished from damages for injury to person or property.*" *Id.* at 310 (emphasis in original).

Here, Plaintiffs allege damage due to the loss of "fifteen of their embryos [that] were harmed by exposure to Defendants' defective solution[]" which is characterized as property damage at the minimum. *Id.* at 6. They also allege physical damages incurred by Plaintiff 007, "in creating the damaged property[,]" *id.* at 7, involving "weeks of medical monitoring, daily injectable medications with significant side effects," and surgery, *id.* at 8, and in "undergo[ing] further physical injury in an attempt to create new embryos[,]" *id.* at 7. Because Plaintiffs plead property and physical harms, not purely economic loss, the economic loss rule does not apply.

As to the charge that Plaintiffs' emotional damages are barred by Oregon's physical impact rule, Plaintiffs respond that they "have alleged both bodily injury and property damage[]" sufficient to recover emotional distress damages under Oregon's "physical impact rule." *Id.* at 7.

Oregon's physical impact rule provides that "in the absence of any physical injury," a plaintiff cannot claim "emotional distress damages caused by a defendant's negligence." *Butters v. Travelers Indem. Co.*, No. 3:22-cv-726-SB, 2023 WL 3559472, at *2 (D. Or. May 18, 2023) (quoting *Paul v. Providence Health System-Oregon*, 351 Or. 587, 597 (2012)). The physical impact rule includes three exceptions, which Plaintiffs do not argue here.

Defendant replies that 'Plaintiffs' claimed physical harm was not caused by the defective media" but instead by the "common physical strain that women

experience while undergoing ART [including the] egg-retrieval procedures[.]"  Def. Reply at 2, ECF No. 30.  Defendant asserts that because Plaintiffs' "alleged "physical harm" arose prior to the use of the allegedly defective media[,] Plaintiffs' alleged physical pains would have been experienced regardless of whether the media was allegedly defective or not." *Id.* at 3.

But Plaintiffs allege emotional distress damages resulting not from the physical impact of the first round of IVF, but from the loss of Plaintiffs' embryos and from "undergo[ing] further physical injury in an attempt to create new embryos." Pl. Resp. at 7.  Relying on *In re Pac. Fertility Ctr. Litig.*, No. 18-cv-01586-JSC, 2021 WL 5161926 (N.D. Cal. Nov. 5, 2021), Plaintiffs argue that, even if the Court finds that embryos are property, the loss of embryos is different from the loss of ordinary property.  Pl. Resp. at 7; *In re Pac. Fertility Ctr.*, 2021 WL 5161926, at *9 (upholding a jury's finding of non-economic emotional distress damages resulting from the loss of embryos caused by defective ART equipment).  Because Plaintiffs allege embryo loss and physical (bodily) injuries, damages that resulted after use of the defective culture media, the Plaintiffs' claim for emotional distress damages survives the physical impact rule at the pleading stage.

In sum, the Court concludes that Plaintiffs sufficiently plead damages. Plaintiffs' alleged damages from embryo loss are not too "speculative and remote" because caselaw provides, at the very least, that the loss of embryos is compensable in tort as property loss, and the damages amount can be established by expert testimony.  Oregon's economic loss rule does not apply because Plaintiffs allege

damages from the loss of fertilized embryos and physical damage (from Plaintiff 007's medical procedures to create embryos), which do not constitute pure economic loss as contemplated by the economic loss rule. Finally, Plaintiffs' claim for emotional distress damages arises from embryo loss and from the physical injuries that Plaintiffs sustained from further IVF procedures.

The Court concludes that Plaintiffs sufficiently allege both causation and damages, as well as duty and breach, to support their claim of negligence.

B. *Gross Negligence*

Defendant asserts that Plaintiffs do not sufficiently allege gross negligence because their allegations that "CooperSurgical had knowledge of issues with the recalled media and acted intentionally, disregarding the risks" are "insufficient to meet the pleading standard" because "Plaintiffs do not support such legal conclusions with facts about CooperSurgical's knowledge and conduct." Surg. Mot. at 8.

Under Oregon law, the elements of gross negligence are: "(1) negligence accompanied by the actor's conscious indifference to the rights of others, or (2) negligence which is increased in magnitude by the actor's reckless disregard of the rights of others." *Logan v. West Coast Benson Hotel*, 981 F. Supp. 1301, 1324 (D. Or. 1997) (quoting *State of Oregon v. Hodgdon*, 244 Or. 219, 223 (1966)). "To establish gross negligence, plaintiff [must] show that defendant acted with reckless disregard of safety or indifference to the probable consequences of its acts." *Howard v. Chimps, Inc.*, 251 Or. App. 636, 647 (2012).

Plaintiffs respond that they "allege[] that Defendants failed to adequately test or inspect their media prior to distribution" and "fail[ed] to ensure that their product was safe[]." Pl. Resp. at 11. Plaintiffs argue that Defendants were "aware of the dangerous consequences of [failing to test their product]" and of "the extreme value people place on developing embryos," and that by failing to test their product, Defendants "acted in reckless disregard for Plaintiffs and their irreplaceable developing human embryos." *Id.*

The Court concludes that Plaintiffs meet the pleading standard for gross negligence by alleging that Defendant knowingly disregarded the risk of failing to test and inspect its culture media before distribution, when Defendant knew that the culture media would be used to support developing embryos.

C.  *Negligent Failure to Recall*

Defendant argues that this claim fails because "CooperSurgical issued a recall for the impacted media," Plaintiffs do not support their claim with "basic facts[,]" and it is unclear whether "Oregon . . . recognize[s] a so-called 'duty to recall[.]'" Surg. Mot. at 9.

Plaintiffs concede that Defendant recalled the defective media but allege that Defendant could have and should have recalled it sooner. Compl. ¶¶ 120–125 ("For a significant period of time before they issued the recall of [the defective culture], Defendants knew and/or should have known" that the culture was not properly formulated and "posed an unreasonable risk of contamination to developing embryos."). Plaintiffs assert that "Defendants had an ongoing duty to recall the

solution from the market before their defective solution ruined Plaintiffs' embryos, since they were aware of the defect before then." Pl. Resp. at 12.

Although Oregon has not recognized a distinct duty to recall, Plaintiffs argue that they should be able to advance such a claim because it is similar to a negligence claim "except that Defendants' wrongful act was not only the manufacture of a defective solution, but their refusal to warn Plaintiffs' fertility clinic *before* the solution was used on Plaintiffs' embryos." Pl. Resp. at 11. To support their argument, Plaintiffs cite *Phelps v. Wyeth, Inc*, 938 F. Supp. 2d 1055, 1066 (D. Or. 2013), in which the court permitted plaintiffs to advance a claim for the negligent failure "to update [a prescription's] label." The *Phelps* court reasoned that "Oregon's product liability statute embraces all theories a plaintiff can claim in an action based on a product defect, including claims based on theories of negligence." *Phelps*, 938 F. Supp. 2d at 1066 (internal quotation marks and citations omitted); *see also Kambury v. DaimlerChrysler Corp.,* 185 Or. App. 635, 639 (2003); *Simonsen v. Ford Motor Co.,* 196 Or. App. 460, 466 (2004).

Like the failure-to-update-prescription-labeling claim in *Phelps*, Plaintiffs' failure-to-recall claim is consistent with and falls within Oregon's broader product liability law. That law, ORS 30.900, defines a product liability action as an action against a product manufacturer "for damages for personal injury, death or property damage arising out of: . . . (2) Any failure to warn regarding a product; or (3) Any failure to properly instruct in the use of a product." ORS 30.900. Here, Plaintiffs allege that they suffered personal and property injuries from Defendants' failure to

timely recall the defective culture media. A failure-to-recall claim is consistent with a failure-to-warn claim under ORS 30.900(2) because a product recall is a warning about a manufacturing or design defect that a manufacturer discovers *after* a product has been distributed. *See, e.g.*, *In re Pac. Fertility Ctr.*, 2021 WL 5161926, at *2 ("[T]he determination of negligence under a failure to recall or retrofit theory focuses on due care and the reasonableness of the defendant's conduct[,] . . . [given] that it is defendant's knowledge of the defect and the serious risk of harm that gives rise to a duty of care.") (internal quotation marks and citation omitted).

Since courts have already determined that "Oregon's product liability statute embraces all theories . . . based on a product defect," and that a failure to recall theory is consistent with and falls within Oregon's broader product liability law but is distinct in imposing an ongoing duty to warn, the Court concludes that Plaintiffs sufficiently and plausibly allege a failure to recall claim under Oregon's broader product liability law.

D.    *Unjust Enrichment*

Defendant asserts that Plaintiffs' claim for unjust enrichment fails because Plaintiffs themselves did not "purchase[] their media" from CooperSurgical, "Plaintiffs *did* receive what they bargained for—they obtained six blastocysts during their IVF cycle[,]" and "Plaintiffs fail to offer any facts to show that it would be unjust for CooperSurgical to retain any alleged benefit." Surg. Mot. at 10 (emphasis in original).

In *Larisa's Home Care, LLC v. Nichols-Shields*, 362 Or. 115 (2017), the Oregon Supreme Court took aim at Oregon's unjust enrichment caselaw, which conflated principles of restitution with a standalone tort claim. *Larisa* set out categories of cases, such as quasi-contract and fraud, that are properly subject to unjust enrichment claims. *Id.* at 129–130, 139. Cases sounding in quasi-contract, such as this one, apply the following elements to determine whether they state an unjust enrichment claim: (1) a benefit conferred, (2) awareness by the recipient that [it] has received the benefit, and (3) it would be unjust to allow the recipient to retain the benefit without requiring her to pay for it. *Id.* at 129–30. A "plaintiff in an unjust enrichment claim can confer a benefit on the defendant through the actions of a third party." *Motameni v. Adams*, No. 3:21-cv-01184-HZ, 2022 WL 3682940, at *10 (D. Or. Aug. 25, 2022). "The defendant only needs to have received a benefit that rightfully belongs to the plaintiff." *Id.*

Plaintiffs allege "that Defendant[] received a benefit in the form of money paid by [third party] Plaintiffs' fertility clinic for the [defective culture media,];" *id.* at 13, that Plaintiffs did not receive what they bargained for because "the [defective culture media] was unfit for its intended use[,]" *id.*; and "that, based on Defendants' representations, Plaintiffs expected that their embryos would be placed in a properly manufactured solution that would foster [the embryos'] development[,]" *id.* at 14. The Court concludes that Plaintiffs sufficiently allege the elements of an unjust enrichment claim: that Defendants received a benefit in the form of payment via a third party, that the benefit of a non-defective media culture rightfully belonged to

Plaintiffs, and that Defendant's retention of payment for the product is unjust because the culture media was defective.

E. *Trespass to Chattels*

Defendant argues that this claim fails because "Plaintiffs do not—and cannot—allege plausible facts that CooperSurgical *intentionally* interfered with their control of their fertilized eggs." Surg. Mot. at 11 (emphasis in original).

In Oregon, to prevail on a claim for trespass to chattel, a plaintiff must set out each element of a claim for conversion. Trespass to chattels permits recovery when the "chattels . . . are not sufficiently important to be classed as conversion." *Morrow v. First Interstate Bank of Oregon, N.A.*, 118 Or. App. 164, 168 (1993). "[T]he gist of the lesser claim of trespass to chattels is the disturbance of the plaintiff's possession." *Id.*

A conversion claim requires a plaintiff to show the "*intentional* exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel." *Mustola v. Toddy*, 253 Or. 658, 663 (1969) (internal quotations and citations omitted) (emphasis added).

Here, Plaintiffs allege that "Defendants purposefully distributed media that they knew or should have known would destroy or severely damage any embryos that were placed in the media[,]" and that "[t]his purposeful action had the effect of interfering with Plaintiffs' right to control and use their property." Pl. Resp. at 15. The chattels that Defendant allegedly converted are Plaintiff's embryos. But

Plaintiffs do not (and cannot) allege that Defendant "intended to exercise dominion or control" over Plaintiffs' embryos. The Court concludes that Plaintiffs do not sufficiently allege trespass to chattels.

In sum, Plaintiffs have plausibly and sufficiently pleaded each of the disputed claims except for trespass to chattels.

F. *Leave to Amend*

Plaintiffs request leave to amend their Complaint for any insufficient claims. Pl. Resp. at 15. The only insufficient claim is the trespass to chattels claim.

Generally, Federal Rule of Civil Procedure 15 "advises the court that leave shall be freely given when justice so requires[] . . . and that "[t]his policy is to be applied with extreme liberality." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003) (internal quotation marks and citation omitted).

"Dismissal without leave to amend is proper only if it is clear . . . that the complaint could not be saved by any amendment." *McKesson HBOC, Inc. v. New York State Common Ret. Fund, Inc.*, 339 F.3d 1087, 1090 (9th Cir. 2003) (internal quotation marks and citations omitted). "[A] proposed amendment is futile only if no set of facts can be proved under the amendment to the pleadings that would constitute a valid and sufficient claim or defense." *Sweaney v. Ada Cnty., Idaho*, 119 F.3d 1385, 1393 (9th Cir. 1997) (alteration in original) (citation omitted). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *United States ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1052 (9th Cir. 2001).

Here, the Court has determined that Plaintiffs' trespass to chattels claim is insufficient because Plaintiffs did not and could not plead that Defendant intentionally sought dominion and control over Plaintiffs' embryos, an essential element of a trespass to chattels claim. There is no set of plausible facts that would allow Plaintiffs to allege such intent. Accordingly, leave to amend is denied because amendment would be futile.

## II.    *Claims against Defendant Cooper Companies*

Defendant Cooper Companies moves to dismiss Plaintiffs' claims for lack of personal jurisdiction under Rule 12(b)(2) and for failure to state a claim under Rule 12(b)(6).

### A.    *Personal Jurisdiction*

Cooper Companies first moves to dismiss the claims against it for lack of personal jurisdiction. The parties agree that Defendant is not subject to general personal jurisdiction in Oregon and that only specific jurisdiction is at issue. Defendant asserts that it is not subject to specific personal jurisdiction in Oregon.

Specific or case-linked jurisdiction "focuses on 'the relationship[s] among the defendant, the forum, and the litigation.'" *Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (quoting *Walden v. Fiore*, 571 U.S. 277, 287 (2014)). The Ninth Circuit uses a three-part test to determine whether specific jurisdiction is proper:

> (1) the defendant must "purposefully direct [its] activities or perform some act or consummate some transaction with the forum" or otherwise "purposefully avail[] itself of the privileges of conducting activities in the forum;"

(2) the claim must "arise[ ] out of or relate[] to the defendant's forum-related activities;" and

(3) the exercise of jurisdiction must be reasonable.

*Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004). The plaintiff bears the burden of satisfying the first two prongs. *Id.* If the plaintiff succeeds on the first two prongs, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Id.*

As to the first prong, when a claim sounds in tort, as here, a plaintiff must show that the defendant purposefully directed its activities at residents of the forum state. *Id.* To show purposeful direction, a plaintiff must satisfy the three-part *Calder* effects test. *Id.* at 805. The *Calder* test "focuses on the forum in which the defendant's actions were felt, whether or not the actions themselves occurred within the forum." *Yahoo! Inc.*, 433 F.3d at 1206 (quoting *Schwarzenegger,* 374 F.3d at 803). The *Calder* test requires a showing that the defendant "(1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state." *Id.*

Plaintiffs allege that Cooper Companies is subject to specific jurisdiction in Oregon because it purposefully directed activity into Oregon or, alternatively, that CooperSurgical's jurisdictional contacts can be imputed to it. CooperSurgical does not contest that it is subject to specific jurisdiction in Oregon.

      1.    *Cooper Companies' Direct Contacts*

Plaintiffs allege that Cooper Companies is subject to specific jurisdiction in Oregon because it "manufactured, marketed, promoted, distributed, and sold the defective culture media that ruined Plaintiffs' embryos[,]" Pl. Resp. at 5; "distributed the defective media to fertility clinics in Oregon, including the clinic where Plaintiffs underwent treatment[,] *id.* at 6; and "knew that distributing faulty media could result in the demise of human embryos," *id.* Defendant, via the sworn testimony of Aloma Avery, its Senior Director of Global Corporate Law & Transactions refutes Plaintiffs' allegations. *See* Avery Decl. ¶ 3, Ex. A, ECF No. 19-1. Avery states that "[Defendant] does not (and did not) develop, manufacture, or market embryo culture media," and "[t]hus, . . . did not . . . develop, manufacture, or market embryo culture media that was allegedly utilized by Plaintiffs[.]" Avery Decl. ¶ 3. Avery also states that "[Defendant] does not (and did not) market, sell, or distribute embryo culture media in Oregon or elsewhere" and "was not involved in the sale or marketing of the embryo culture media that is allegedly involved in this lawsuit." *Id.* at ¶ 4. Defendant provides sworn testimony that it did not engage in the acts that give rise to Plaintiffs' claims. Plaintiffs have submitted no comparable evidence to support their contrary allegations.

"Although 'uncontroverted allegations in the complaint must be taken as true' and '[c]onflicts between parties over statements contained in affidavits must be resolved in [the plaintiff's] favor,' disputed allegations in the complaint that are not supported with evidence or affidavits cannot establish jurisdiction." *AMA*

*Multimedia, LLC v. Wanat*, 970 F.3d 1201, 1207 (9th Cir. 2020) (quoting *Schwarzenegger*, 374 F.3d at 800.

Here, Defendants directly refute Plaintiffs' allegations with sworn testimony, and Plaintiffs fail to counter with evidence or affidavits of their own. For that reason, Plaintiffs fail to make a *prima facie* case that Cooper Companies purposefully directed activity into Oregon and is subject to specific jurisdiction in Oregon.

2.    *Cooper Companies' Imputed Contacts*

Plaintiffs allege that subsidiary CooperSurgical's jurisdictional contacts with Oregon can be imputed to parent Cooper Companies. Pl. Resp. at 11. "It is well-established that a parent-subsidiary relationship alone is insufficient to attribute the contacts of the subsidiary to the parent for jurisdictional purposes." *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd.*, 328 F.3d 1122, 1134 (9th Cir. 2003). "Two exceptions to that general rule exist, however—a subsidiary's contacts may be imputed to the parent where the subsidiary is the parent's alter ego, or where the subsidiary acts as the general agent of the parent." *Id.* Plaintiffs allege both theories.

a.    *Imputed Contacts - Agency Theory*

In *Daimler AG v. Bauman*, 571 U.S. 117, 135–36 (2014), the Court rejected the Ninth Circuit's agency approach for imputing a subsidiary's contacts to its parent to establish general personal jurisdiction. But *Daimler* "left open the question of whether an agency relationship might justify exercise of *specific* jurisdiction." *Williams v. Yamaha Motor Co.*, 851 F.3d 1015, 1023 (9th Cir. 2017) (citing *Daimler AG*, 571 U.S. 117, 135 n.13) (emphasis added). Since *Daimler*, the Ninth Circuit has

used an agency theory to justify the imputation of jurisdictional contacts but only as to specific jurisdiction.  *Id.* at 1024.

Under the agency theory, a subsidiary acts as the agent of the parent when it acts "on the principal's behalf and subject to the principal's control."  *Id.* (quoting Restatement (Third) of Agency § 1.01 (2006).   To establish imputed contacts, a plaintiff must show that "the principal company [has] the right to substantially control its subsidiary's activities."  *Id.* at 1024–25.  "[T]he appropriate standard for assessing an agency relationship under *Williams* is "substantial control."  *In re ZF-TRW Airbag Control Units Prods. Liab. Litig.*, 601 F. Supp. 3d 625, 700 (C.D. Cal. 2022).  In *Williams*, the plaintiffs failed to establish specific jurisdiction because they "neither allege nor otherwise show that [parent company] had the right to control [subsidiary company's] activities in any manner at all."  *Williams*, 851 F.3d at 1025. But in *In re ZF-TRW Airbag Control*, Plaintiffs successfully established imputed contacts by providing specific, non-conclusory, and *undisputed* factual allegations about the mechanisms the parent company used to control the subsidiary company. *In re ZF-TRW Airbag Control*, 601 F. Supp. 3d at 700–701.

Here, Plaintiffs allege that "CooperSurgical is a wholly owned subsidiary of [Cooper Companies],"  Compl. ¶ 14, and that "Cooper Companies exercises a significant degree of control over its subsidiary, CooperSurgical[,]" *id.* at ¶ 13. Plaintiffs provide the following allegations to show how Cooper Companies exercises control over CooperSurgical: (1) "Cooper Companies employs and controls CooperSurgical's top executive, President Holly Sheffield, whose employment

agreement is exclusively with Cooper Companies," and who "works predominantly from one of The Cooper Companies' offices [,]" *id.* at ¶ 38; (2) "[t]hree of CooperSurgical's other principals . . . are also employed at The Cooper Companies' principal address," an address filed with the Connecticut Secretary of State in 2024, *id.*; and (3) "Cooper Companies' FY23 Form 10-K lists 'CooperSurgical research & development and administrative offices' as one of the operations within its principal facilities where it maintains its own executive offices[,]" *id.*

Defendant's declaration directly refutes several of Plaintiffs' allegations. Avery testifies that "[Defendant] is the parent corporation owning Cooper Medical, Inc." and that "CooperSurgical, Inc. is a wholly owned subsidiary of Cooper Medical, Inc." Avery Decl. ¶¶ 6–7. Avery testifies that "[Defendant] is a corporate legal entity that is separate and distinct from CooperSurgical, Inc.[,]" *id.* at ¶ 8, that it "is a separate, standalone legal entity from CooperSurgical, Inc.[,] *id.* at ¶ 9, that "[CooperSurgical] has . . . separate executive officers responsible for the day-to-day operations of CooperSurgical[,]" *id.* at ¶ 11, that "[CooperSurgical] generates its own cash flow, which is used to pay its own bills, and maintains its own separate books[,]" *id.* at 12, and that "[Defendant] did not direct CooperSurgical in any way on its day-to-day operations in relation to the design, manufacture, sale, or distribution of the subject embryo culture media in Oregon or elsewhere[,]" *id.* at 13. Defendant further asserts that Plaintiffs' allegations are "conclusory" and not supported by "any affidavits or evidentiary materials[.]" Def. Reply at 6, ECF No. 31.

The Court agrees. As explained above, "disputed allegations in the complaint that are not supported with evidence or affidavits cannot establish jurisdiction." *AMA Multimedia,* 970 F.3d at 1207. Further, unlike *In re ZF-TRW Airbag Control,* 601 F. Supp. 3d at 700–701, Plaintiffs' allegations are conclusory and fail to set out with specificity the mechanisms by which Defendant exercises substantial control over CooperSurgical. Because Plaintiffs have not alleged with specificity how Defendant exercises substantial control over CooperSurgical and because Plaintiffs have not refuted Defendant's evidence with affidavits or declarations of their own, Plaintiffs fail to establish an agency relationship to justify the imputation of CooperSurgical's jurisdictional contacts to Defendant.

### a. *Imputed Contacts – Alter Ego Theory*

Plaintiffs also allege that CooperSurgical's Oregon contacts can be imputed to Defendant because "CooperSurgical and [Defendant] acted as the 'alter egos' of one another." Pl. Resp. at 10; *see also* Compl. ¶ 16. The alter ego theory may be used to impute the contacts of one affiliated company to another. *See Ranza v. Nike, Inc.,* 793 F.3d 1059, 1073 (9th Cir. 2015); *Seiko Epson Corp. v. Print-Rite Holdings, Ltd.,* No. CV 01-500-BR, 2002 WL 32513403, at *14 (D. Or. Apr. 30, 2002) ("Affiliated companies that hold themselves out to the public as a single entity that is conveniently departmentalized may be the alter egos of one another for jurisdictional purposes.") (citations omitted). "The alter ego test is designed to determine whether the parent and subsidiary are not really separate entities, such that one entity's

contacts with the forum state can be fairly attributed to the other." *Ranza*, 793 F.3d at 1071 (internal quotation marks and citation omitted).

To satisfy the alter ego test, a plaintiff must show "(1) that there is such unity of interest and ownership that the separate personalities [of the two entities] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice." *Ranza,* 793 F.3d at 1073. The first prong is supported by evidence that the parent company "controls . . . the subsidiary's internal affairs or daily operations." *Id.* at 1071; *see also Seiko Epson Corp.*, 2002 WL 32513403, at *23–26 (internal quotation marks, ellipses, and citation omitted) (examining factors that weigh in favor of "piercing the corporate veil" such as a common marketing image, common directors and officers, the failure to comply strictly with the formalities of corporate organization, and general agency).

Here, Plaintiffs make the same allegations to support the alter ego theory that they make to support the agency theory. And Defendant again asserts the sworn testimony that contradicts many of those allegations. In addition, Defendant adds that "[Defendant] observes formal legal requirements and corporate formalities to maintain its corporate separateness [from CooperSurgical]." Avery Decl. ¶ 10. Again, Plaintiffs do not prevail because their allegations lack specificity and are refuted by Defendant's declaration. To overcome Defendant's factual evidence, Plaintiffs must provide affidavits, declarations, or other factual evidence of their own. For these reasons, Plaintiffs fail to establish an alter ego basis to justify imputation of CooperSurgical's jurisdictional contacts to Defendant.

3. *Jurisdictional Discovery*

To carry their burden to show that the exercise of jurisdiction over Cooper Companies is proper, Plaintiffs request leave to conduct targeted jurisdictional discovery and to amend their Complaint because "[they] believe further facts supporting jurisdiction can be uncovered through targeted jurisdictional discovery[.]" Pl. Resp. at 11.   Defendant argues that "[a]dditional discovery is unwarranted[]" because Plaintiffs' belief that they will discover more facts is "little more than a hunch." Def. Reply at 12 (quoting *Boschetto*, 539 F.3d at 1020).

District courts have broad discretion to control discovery. *Little v. City of Seattle*, 863 F.2d 681, 685 (9th Cir. 1988). "Such rulings will not be overturned unless there is a clear abuse of discretion." *Id.*   "[Jurisdictional] discovery should ordinarily be granted where pertinent facts bearing on the question of jurisdiction are controverted or where a more satisfactory showing of the facts is necessary." *Laub v. U.S. Dep't of Interior*, 342 F.3d 1080, 1093 (9th Cir. 2003).

Here, the facts are both controverted and insufficient to determine whether Defendant Cooper Companies is subject to specific jurisdiction in Oregon.  The Court grants ninety days leave to conduct jurisdictional discovery to determine whether Cooper Companies has jurisdictional contacts with Oregon.

## B. *Failure to State a Claim*

Cooper Companies also moves to dismiss Plaintiffs' claims under Rule 12(b)(6). The Court defers ruling on Cooper Companies' 12(b)(6) motion until jurisdiction has been decided.

## CONCLUSION

For the reasons explained, CooperSurgical, Inc's Motion to Dismiss, ECF No. 24, is GRANTED in part and DENIED in part. The Court DEFERS ruling on The Cooper Companies, Inc's Motion to Dismiss for lack of personal jurisdiction, ECF No. 19, and its Motion to Dismiss for failure to state a claim, ECF No. 25. Plaintiffs have 90 days to conduct limited jurisdictional discovery consistent with this Opinion. The Court further ORDERS the parties to contact the Court to schedule a Telephonic Status Conference to occur within 30 days to (1) apprise the Court of any questions the parties have and (2) advise the Court on the status of production.

It is so ORDERED and DATED this  31st  day of March 2025.


 /s/Ann Aiken
ANN AIKEN
United States District Judge